The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EAGLE HARBOR HOLDINGS, LLC,
and MEDIUSTECH, LLC,

     *Plaintiffs,*

*v.*

FORD MOTOR COMPANY,

     *Defendant.*

Case No. 3:11-cv-05503-BHS

**EAGLE HARBOR'S OPPOSITION TO FORD MOTOR COMPANY'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

1  Because a reasonable juror could conclude that Ford infringes the asserted patents and

2  award damages for that infringement, and because in fact, *significant* evidence supports such a

3  finding, Eagle Harbor respectfully requests that the Court deny Ford's Motion for Judgment as

4  a Matter of Law.

## I. LEGAL STANDARD

6  Judgment as a matter of law may be granted only if "there is no legally sufficient

7  evidentiary basis for a reasonable jury to find" for the non-movant. Fed. R. Civ. P. 50(a)(1). In

8  ruling on a motion for judgment as a matter of law, a court reviews all the evidence in the

9  record and must draw all reasonable inferences in favor of the nonmoving party. *See Reeves v.*

10 *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). A court may not make credibility

11 determinations or weigh the evidence, as those are solely functions of the jury. *Id.* The moving

12 party is entitled to judgment as a matter of law "only if no reasonable juror could return a

13 contrary verdict." *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

## II. A REASONABLE JUROR COULD CONCLUDE THAT FORD INFRINGES THE '137 PATENT

### A. Dr. Min's testimony supports a finding of direct infringement.

Dr. Min's testimony establishes that both of the "steering queues" that Active Park Assist

("APA") generates occur *after* the step in which "the comparison indicates a possible collision

consists between the identified object and the local vehicle." First, Dr. Min testified that the

steering signals that are sent to the steering column in APA are generated *after* the APA system

detects that the actual vehicle position has deviated from the trajectory calculated in relation to

the identified objects, and that such a deviation constitutes a possible collision condition. 3/11

Tr. 218:23–219:11. Second, Dr. Min testified that APA continues to maintain control of the

steering column in this way during the forward part of the parking maneuver after a warning

indication is given to avoid a collision when the vehicle reaches the back end of the trajectory.

3/11 Tr. 219:12–21. Dr. Min testified that both of these steering signals are generated after a

kinematic state comparison indicates a possible collision condition. 3/11 Tr. 219:18–21.

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 1*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

With respect to the steering signals that are generated during the initial rearward move, Ford postulates an extraneous requirement that the steering queue be generated after the warning indication. But this was not the Court's construction. By its own terms, the Court's construction requires only that the steering queue be generated after the kinematic state comparison indicates a collision condition, not after the warning signal that is also issued as a result of such a comparison. The rationale for this sequence is that the generation of the steering queue depends on the result of the comparison. *See* Dkt. 165 at 17. But no such dependency exists between the warning signal and the steering queue, and the Court's construction is correspondingly silent about any sequence in which these events must occur, so long as both are generated in response to a kinematic state comparison that indicates a collision condition. Dr. Min has opined that both steering signals and warning indications are generated at various times in response to a continuous comparison of the vehicle with the calculated trajectory, satisfying the sequence requirement of the Court's construction.

With respect to the direction to the driver to pull forward that also provides a direction for the vehicle to travel and therefore also constitutes a steering signal, Ford mischaracterizes Dr. Min's response to an ambiguous question and ignores his clear testimony during the same examination that this signal, too, is also generated after a collision condition has been detected, simultaneously with a warning signal. Mr. Lee asked Dr. Min: "The forward prompt, the move forward, occurs only after the driver has stopped the car, correct?" 3/12 Tr. 42:5–6. Dr. Min's, "Yes, that's right" refers to Mr. Lee's correction of himself to refer to "the move forward," which Dr. Min did not claim was a steering queue, instead of "the forward prompt," which he does. This is made clear only a few questions later:

> Q. Is it not true that at the time the pull-forward prompt is issued or given to the driver, there is no more collision condition?
>
> A. So this prompt that you're referring to, I think it is issued at the same time.

3/12 Tr. 42:19–23. Thus Dr. Min is clear that the forward prompt is generated concurrently with the warning indication in response to the same collision condition, namely the danger of

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 2*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

hitting the rear vehicle if the driver does not stop and change directions. This, too, is substantial evidence of direct infringement of this limitation that precludes judgment as a matter of law.

Dr. Min's opinion that the APA system can identify objects that surround a parking space is hardly conclusory and is directly supported by the exhibit that Ford seeks to dismiss. PX-444 specifically articulates the requirement that the APA system be able "to distinguish between curbs and walls" and "classify high and low objects." PX-444.006. It further indicates that Valeo agreed to implement this requirement in APA. PX-444 further specifies a number of parking scenarios that APA is required to handle that require identification of different types of objects, such as "non-vehicle objects" and "high/small critical objects," PX-444.008, as well as "front objects" and "rear objects," PX-444.011. This evidence is more than sufficient for a reasonable jury to find infringement.

### B.   Eagle Harbor Has Met Its Burden of Showing Infringement by a Third Party.

Eagle Harbor has shown direct infringement of claim 29 of the '137 patent by both direct and circumstantial evidence. First, Eagle Harbor has shown at least one instance of direct infringement by direct evidence: Dr. Paul Min testified that he himself had used the patented method on a Ford rental car. 3/11 Tr. 208:7–18. Second, Eagle Harbor has shown direct infringement by circumstantial evidence. Dr. Min testified that APA infringes claim 29 of the '137 patent whenever *the driver uses the system for its intended purpose*. 3/11 Tr. 208:1–6. In addition, Michelle Moody, Ford's corporate designee on the instructions, directions and guidance Ford provides users of APA, testified that Ford instructs its customers as to how to operate the APA system, including in its owners' manuals, quick reference guides, training material for their sales consultants (who they expect to communicate with the customer during the selling process and delivery), a how-to video, and on the Ford webpage. 3/13 Tr. 167:25–169:7. Since APA infringes claim 29 when used as intended, these directions instruct Ford customers to practice the patented method. Ms. Moody further testified that "when Ford sells a vehicle that has the Active Park Assist feature on it, the intention is that the customer will use the feature." 3/13 Tr. 167:20–24 ("A: We sell the vehicle, yes, hoping they will use the feature.").

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 3*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

Such circumstantial evidence of direct infringement is sufficient for Eagle Harbor to meet its burden of showing direct infringement. *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1317–20 (Fed. Cir. 2009); *see also Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986).

### C.  Eagle Harbor Has Met Its Burden of Showing Specific Intent for Inducement.

Liability under § 271(b) "requires knowledge that the induced acts constitute patent infringement." *Global–Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068 (2011); *see also DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed. Cir. 2006) ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."). Specific intent may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement. *See MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1378 n. 4 (Fed. Cir. 2005); *Metabolite Labs. Inc. v. Lab. Corp. Am.*, 370 F.3d 1354, 1365 (Fed. Cir. 2004).

Affirmative steps that demonstrate specific intent to induce infringement include advertising infringing uses and instructing customers to use an accused device in an infringing manner. For instance, "[p]roviding instructions to use a product in an infringing manner is evidence of the required mental state for inducing infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014). Moreover, "advertising an infringing use or instructing how to engage in an infringing use show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (citing case law with the following examples of advertising and providing instructions for an infringing use: "demonstrations by sales staff of infringing uses," "the use depicted by the defendant in its promotional film and brochures infringes the patent"); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 4*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

1042, 1060 (Fed. Cir. 2010) ("Apotex included instructions in its proposed label that will cause at least some users to infringe the asserted method claims.").

Additionally, when a patent owner can show that an accused product or component has no "purpose other than the performance of infringing functions under normal use conditions," the design and manufacture of that product itself can establish specific intent to induce infringement. *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1343 (Fed. Cir. 2008); *see also Water Techs. Corp. v. Calco*, 850 F.2d 660, 668–69 (Fed. Cir. 1988) (inferring specific intent for inducement, in part, by defendant's knowledge of patent and control over design of infringing products); 4 D. Chisum, *Patents*, § 17.04 [4][d], at 17-52 (design of infringing product may constitute active inducement); *see also Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1366 (Fed.Cir. 2012) (*citing Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009)) ("This is not the first time we have concluded that where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement.").

Accordingly, Ford's statement that "[i]t is well-settled that merely instructing users how to use a product is insufficient to establish affirmative intent" is false. Mot. at 6. Where an infringer has knowledge of the patent, instructing users how to engage in an infringing use or designing and manufacturing a product with no non-infringing uses provides circumstantial evidence sufficient to demonstrate specific intent.

First, there is no dispute that Ford had knowledge of the '137 patent. Mr. Dan Preston and Mr. Jeffrey Rupp testified concerning the transmission of the '137 patent to individuals at Ford, and documentary evidence shows both that transmission and the access by someone at Ford. 3/12 Tr. 157:24–161:14, 164:22–166:20; 3/17 Tr. at 103:12–108:11; PX-34; PX-2119. And Ford has apparently conceded that they were aware of the patent. 3/13 Tr. 44 ("Ford has never disputed that it got the [137] patent from you. . . Ford said we got the link, we don't know who clicked on it, but we don't disagree that we got the patent back in 2003 or 2004.").

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 5*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

Second, Ford had affirmative intent to induce infringement. According to Dr. Min, the Active Park Assist system infringes claim 29 of the '137 patent whenever the driver uses the system for its intended purpose. 3/11 Tr. 208:1–6. And Ford regularly instructs its customers on how to operate the APA system according to the infringing method. As Ms. Moody testified, Ford provides to its customers instructions as to how to operate the APA system, including in its owners' manuals, quick reference guides, a how-to video, and on the Ford webpage. 3/13 Tr. 167:25–169:7. Ford provides training material for their sales consultants on how to use the feature and expects them to communicate with the customer during the selling process and delivery. *Id.* Ms. Moody further testified that "when Ford sells a vehicle that has the Active Park Assist feature on it, the intention is that the customer will use the feature." 3/13 Tr. 167:20–24 ("A: We sell the vehicle, yes, hoping they will use the feature."). Such instructions, which necessarily result in the claimed method being followed, combined with knowledge of the patent, is sufficient evidence for the jury to conclude that Ford had specific intent to induce infringement.

### III. A REASONABLE JUROR COULD CONCLUDE THAT FORD INFRINGES THE '260, '739, AND '119 PATENTS

#### A. Dr. Min has shown that SYNC includes the required "configuration manager" of '260 claim 9.

Ford's argument that claim 9 of the '260 patent requires the configuration manager to move an application from one processor to another is reprised from its summary judgment motion and has as little merit here. As the Court ruled in denying that motion, this position amounts to a request for additional claim construction that comes too late in this proceeding. Dkt. 530. Moreover, as Eagle Harbor pointed out in its opposition to that motion, the plain language of the claim does not require that the configuration manager move applications from one processor to another. Rather, the claim language only requires the configuration manager to run applications on multiple different processors within the multiprocessor system. Dkt. 404 at 33–34. The disclosed embodiments in which applications are moved from processor to processor are the express subject of other claims of the '260 patent, namely claim 1 and its dependent

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 6*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

claims, and should not be implied in the distinct claim 9. Dr. Min's testimony establishes in great detail that configuration managers running on different processors in SYNC do this by configuring applications on the processors on which they are running to interoperate with new devices. 3/11 Tr. 161–66.

Ford's claim that Dr. Min has not identified a specific software "module" that constitutes the configuration manager in the ACM likewise recycles an argument that the Court rejected on summary judgment, Dkt. 530, and further ignores Dr. Min's testimony in light of the teaching of the '260 patent at 8:55–60 that the configuration manager need not be implemented in a discrete code module so long as code implementing its functionality is present, which Dr. Min has shown. 3/12 Tr. 76:13–21.

**B.   Dr. Min has shown that the ACM includes the device manager of '260 claim 9.**

Ford again mischaracterizes Dr. Min in claiming that he "only" testified that the ACM receives a message from the APIM in relation to the "device manager" limitation of '260 claim 9. Dr. Min has specifically testified regarding the actions that the ACM takes in response to receiving that message that constitutes detecting and adding a new device to the multiprocessor system. In particular, he refers to the way that the ACM sets up displays and audio routing in a way that configures the ACM and with it the multiprocessor system of which it is a part to interoperate with the new device in an integrated way. 3/11 Tr. 161:2–22.

**C.   Dr. Min has shown that multiple processors within SYNC are coupled by "different communication links"**

Ford's position that the MS_CAN Network constitutes a single link is at odds with both the Court's construction and the teaching of the '260 patent. The court's construction of link as "a data communications *channel*" encompasses the multiple physical and logical channels that Dr. Min has testified make up the MS_CAN Network. 3/11 Tr. 159:6–13. Moreover, the notion that a single in-vehicle network cannot comprise the multiple links of the invention contradicts the disclosure of the '260 patent, in which the multiple processors depicted are all connected by a single in-vehicle network. '260 Patent Fig. 1.

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 7*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

1

2

**D. Dr. Min has shown that SYNC is a "distributed processing system" as required by claim 1 of the '119 patent.**

In denying Ford's motion for summary judgment, the Court has already rejected the argument that a distributed processing system must be one in which a particular task for an application must be moved from one processor to another. Dkt. 530 at 10. The Court's construction requires only that "tasks for applications can be distributed among multiple processors," which Dr. Min has shown. Dr. Min showed how, for example, the task of routing audio data is performed by on the ACM in support of the execution of a media player on the APIM, or, for another, the ACM performs the task of running an appropriate display for the phone application on the APIM. These examples show that SYNC is a distributed processing system under the Court's construction.

**E. Dr. Min has shown that SYNC "download[s]" or "move[s]" applications as required by the asserted claims of the '739 and '119 patents.**

There is nothing conclusory about Dr. Min's explanation of his testing of the phone book application to show how SYNC meets the "move" and "download" limitation of the '739 and '119 patents. Dr. Min's testimony about how the exemplary phone book application is "made available in an address space for execution by the processor" at 3/11 Tr. 181:13–182:6 refers back to his extensive discussion of how the test log admitted as PX-1921 shows that a new instance of the phone book application is loaded into working memory for execution for the first time when a new device is connected. 3/11 Tr. 175:3–179:4; *see also* 3/12 Tr. 77:12–23. Dr. Min's testimony regarding claim 1 of the '119 patent likewise refers back to this extensive previous discussion. 3/11 Tr. 196:25–197:25. In addition, Dr. Min introduced an authoritative reference from Microsoft showing that application code is loaded into memory on demand in Windows CE, the operating system for SYNC. 3/11 Tr. 182:7–183:14; A-598 at 246.

Ford's argument that a "thread" is not itself an "application" in the parlance of the patent ignores Dr. Min's testimony that "applications" as the court has construed that term are in fact instantiated within threads in the architecture of SYNC. 3/12 Tr. 76:25–77:8. Nor did Dr. Min "concede" that he had only identified particular pages of applications being copied into

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 8*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

working memory. His cited testimony states that "each page" of the software making up the application is loaded into the system on demand. 3/11 Tr. 183:5–11. Elsewhere, Dr. Min is clear that the whole software application—the "software, that performs a task to fulfill a specific need of a user"—is loaded into the physical memory of the system. 3/11 Tr. 179:2–4.

Ford's position that the asserted claims of the '739 and '119 patent require an application to be moved or downloaded *before* a new device is connected not only disputed, it is the opposite of the plain sequence of the claims. In claim 1 of the '739 patent, the element of "selectively connect a new device" comes before the element of "automatically move the second software application." PX-008.022. Likewise, in claim 1 of the '119 patent, the element of "connect the new device" occurs before "download the stored application." PX-004.016–17. Dr. Min's analysis of his test logs show that the exemplary instance of an application that he calls out was, in fact, only loaded into memory after a new device was connected to SYNC. 3/11 Tr. 178:9–179:4; 3/12 Tr. 77:12–23. Ford's contention that the phone book application associated with the UpdatePhoneBookGrammarThread that performs the task for the user of updating phone contacts to the system was previously loaded because the process for the PhoneApp shell of which it was a part had previously been initiated seeks to relitigate several issues that Ford has either lost over the course of this case, namely, whether an application is a complete executable file or instead the code within it that performs tasks to fulfill specific needs of the user, Dkt. 165 at 45–48, or that the Court has determined constitutes an issue of fact for the jury, namely, whether the mapping of a stored executable into virtual memory satisfies makes it available in an address space for execution by a processor. Dkt. 530 at 10–12.

Finally, Ford's complaint that Dr. Min identifies different "second software applications" being "identified" at one point in his analysis and others being "moved" at others ignores the fact that Dr. Min's testimony relates to the architecture of SYNC and that each of the applications he discusses are selected and then moved during the operation of the system. Moreover, it is simply false that Dr. Min does not demonstrate this architectural feature of SYNC with respect to any one particular application: he shows the exemplary phonebook

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 9*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

application both being selected, 3/11 Tr. 175:24–176:5, and later being moved into working memory, 3/11 Tr. 178:18–179:4.

### F.   Dr. Min shows that SYNC uses a data manager to "select" a particular processor to run a software application as required by '739 claim 1.

Ford's argument that SYNC does not "select" a processor to run an application is another claim construction position that the Court rejected in denying Ford's summary judgment motion. It is "is based on the claims being construed to mean that selecting a processor means selecting another or different processor than the one currently running an application," which the Court did not construe the claims to require. Dkt. 530 at 14. Dr. Min explained how the operation of data managers on multiple processors that determine whether those processors have applications that correspond to data types supported by new devices meets this limitation within the SYNC system. 3/11 Tr. 179:21–180:16.

### G.   Dr. Min showed that SYNC meets the security limitations of claim 1 of the '119 patent.

Ford is simply incorrect that Dr. Min identified both a link key and Bluetooth profiles as *together* being the "security attribute" of the '119 patent. Rather, Dr. Min identified the link key as being the security attribute, and the Bluetooth profiles as providing further information about the capabilities of the devices associated with that link key. 3/11 Tr. 195:14–196:6. This is made abundantly clear when Dr. Min discusses the companion element in which he describes the link key alone as the "identified security attribute" used to prevent unauthorized data from being processed in SYNC by preventing unpaired phones from accessing data or applications within the system. 3/11 Tr. 196:13–24. Dr. Min returns to the Bluetooth profiles that he previously identified as being associated with the link key for a previously paired device in the context of the subsequent limitations concerning how stored applications that can process the devices data are identified, but he does not equate those profiles with the security attribute. 3/11 196:25–197:25.

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 10*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

**H.   Dr. Min has shown that SYNC takes over control and operation of a new device as required by claims 1 and 3 of the '739 patent.**

The court has already deemed the question of what constitutes taking over control and operation of a new device as a factual one. Dkt. 530 at 15–16. As ever, Dr. Min points out that the connection of a new device with SYNC results not only in the ability to operate the device through the SYNC interface, but also changes the function of the device's own interface so that the device's operations now occur and play out in the context of the overall SYNC system with which it is joined. 3/11 Tr. 183:15–184:12. As ever, Ford takes the position that a device's own interface must be disabled in order for this claim limitation to be met—a position that the Special Master explicitly considered and rejected in deciding not to construe this claim term. Dkt. No. 165 at 68 ("[T]he take over and control of the entire device does not necessarily turn the device into a brick, but rather turns it into a device having functionality controlled by an on-board processor."), adopted by the Court at Dkt. No. 184. Ford's claim that Dr. Min's testimony on this particular limitation is conclusory ignores the fact that this aspect of SYNC was addressed in detail and with reference to SYNC technical documents in the context of his overview of the SYNC system. 3/11 Tr. 121:10–122:1.

**I.   Dr. Min's testimony established that SYNC "configure[s] the particular one of the on-board processors to run the second software application moved from the memory" as required by the '739 patent, claims 1 and 3**

Ford uses counsel's shorthand reference to the final portion of this single limitation—"wherein running the second software application causes the particular one of the on-board processors to take over control and operation of the new device"—to incorrectly suggest that Dr. Min did not address the former portion of this limitation. In addressing how the "running" meets the "wherein" clause, Dr. Min also—and necessarily—addressed the fact that the software that is doing the running is configured to run on the processor. The references in his discussion of this element to the actions of the system that control the device in response to interactions with the vehicle interface all refer to the running of the second software application that was moved from the memory. 3/11 Tr. 183:20–184:8. Moreover, Dr. Min gave an ultimate opinion that claim 1 of the '739 patent was infringed in its entirety, 3/11 Tr. 189:13–16, and that

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 11*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

opinion is amply supported respecting the "configure … to run element" throughout his discussion of the infringement of the infotainment patents. For example, in connection with his extensive discussion of how applications are identified and moved into memory in connection with the preceding data manager limitation of '739 claim 1, Dr. Min discussed how the loading of an application into physical memory of a particular processor in SYNC results in the application being run on that processor. 3/11 Tr. 179:2–4.

## IV.   A REASONABLE JUROR COULD AWARD EAGLE HARBOR DAMAGES FOR FORD'S INFRINGEMENT

### A.   Eagle Harbor Has Introduced Evidence Sufficient to Show Actual Use of APA.

In previous submissions, Eagle Harbor has urged the Court to reconsider whether, under the circumstances of the present case, Federal Circuit law requires Eagle Harbor to establish the extent of actual use to be awarded a reasonable royalty for Ford's infringement of claim 29 of the '137. *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), is the prevailing Federal Circuit authority on the question of how, if at all, the end customer's usage of a method claim should inform the damages calculation,[1] and the *Lucent* court did nothing more than hold that evidence of usage may *at times* be relevant to the hypothetical negotiation:

> Consideration of evidence of usage after infringement started can, ***under appropriate circumstances***, be helpful to the jury and the court in assessing whether a royalty is reasonable. Usage (or similar) data may provide information that the parties would frequently have estimated during the negotiation.

*Id.* at 1333-34 (emphasis added). At the same time, the *Lucent* court made it clear that the reasonable royalty is not capped by the number of instances in which the method is proven to have been practiced:

---

[1] Ford suggests that *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed. Cir. 2012), confirmed that damages for alleged infringement of a method claim must be tied to evidence of use. Mot. at 17. *Mirror Worlds* did not overturn *Lucent*'s rendition of *when* evidence of use is relevant to damages. *Mirror Worlds* relies on the uncontroversial premise that when there is insufficient evidence to establish *infringement by inducement*, no damages can be awarded. *Id.* at 1357 ("In view of the fact that we are affirming the district court's grant of judgment as a matter of law of non-infringement, *we have no need to review its judgment on damages*.") (emphasis added). Because the evidence establishes infringement by inducement of the '137 patent per Part II above, *Mirror Worlds* is not pertinent to the question of whether damages should be awarded for that infringement.

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 12*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

*[W]e have never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence.* Such a strict requirement could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations.

*Id.* at 1334. Because usage is relevant, if at all, as a factor that the parties would have considered during the hypothetical negotiation, whether proof of the extent of actual use is required depends on whether the facts of the case at hand show that the parties to the hypothetical negotiation would have considered it.

Here Ford has conceded that the parties would not have relied on evidence of usage in the hypothetical negotiation, and evidence developed during the trial supports that conclusion as well:

- The Continental Teves license agreement – in which Ford licensed certain method claims to Continental Teves – contains no discussion of actual usage, nor was actual usage of the methods by the end customers the trigger for royalty payments. To the contrary, the trigger for royalty payments under that agreement was the manufacture and *sale* of the licensed products. 3/17 Tr. 44:21-45:12.

- Ford's expert, Ms. Julie Davis, calculates the royalty to which Eagle Harbor should be entitled, in her opinion, in precisely the same way that Mr. Wagner did, by multiplying the number of units of the APA system Ford has *sold*, by the royalty rate she calculated.

- Paul Mascarenas, Ford's former Chief Technical Officer, testified that he was not aware of any surveys conducted by Ford to determine to what extent people who buy the Active Park Assist feature actually use it. 3/17 Tr. 217:12-218:5.

- Mr. Wagner also testified that there is no evidence that Ford considers, measures or tracks actual usage specifically as to APA. 3/17 Tr. 44:9-20.

- Mr. Wagner further testified that there is no evidence that Ford would have considered actual usage as part of the hypothetical negotiation, in light of the Continental Teves license agreement in which Ford granted a license to certain method patent claims and royalty payments were triggered by sales, not usage. 3/17 Tr. 44:21-45:12.

The Court seems to concur that "usage is not a factor in the hypothetical negotiation." Order Denying Eagle Harbor's Motion for Reconsideration (Dkt. No. 597) at 2. Eagle Harbor submits that because the parties to the hypothetical negotiation would not have considered actual usage, and because the Federal Circuit case law requires consideration of actual usage

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 13*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

*only* when the facts and circumstances of the case demonstrate that it is relevant, the jury should decide the question of what reasonable royalty damages, if any, should be awarded for Ford's infringement of the '137 patent.

However, the Court need not reach or consider this legal question. While the Court excluded Mr. Wagner's testimony as to the multiplier, or royalty base, for the APA product, additional evidence has been introduced upon which the jury could base a finding as to the reasonable royalty that should be awarded Eagle Harbor for Ford's infringement of the '137:

- Mr. Mascarenas confirmed that "***Ford's primary concern with Active Park Assist is selling the option and assuming that people that do buy it have a reason to buy it and will use it***." 3/17 Tr. 218:1-5.

- Michelle Moody, Ford's corporate designee, testified that "when Ford sells a vehicle that has the Active Park Assist feature on it, the intention is that the customer will use the feature." 3/13 Tr. 167:20-24 ("A We sell the vehicle, yes, hoping they will use the feature.").

- Dr. Min testified that the Active Park Assist system infringes claim 29 of the '137 patent whenever *the driver uses the system for its intended purpose*. 3/11 Tr. 208:1-6.

- Dr. Min further testified that he himself had used the patented method when testing Ford's APA system. 3/11 Tr. 208:7-18.

- Between the date of first sale and the end of Q4 2014, Ford sold in the United States 373,818 APA units. 3/17 Tr. 158:25-159:2.

The evidence in the record indicates that the parties to the hypothetical negotiation would have triggered royalty payments on sales of the system, not use by end customers. Furthermore, the evidence supports a conclusion by the jury that each time a customer elects to purchase the APA option, that customer would try the option – practicing the claimed method – at least once, if not more times.

Moreover, the Court should not—as urged by Ford—grant judgment as a matter of law that no reasonable juror could award a reasonable royalty for the '137 patent. The Court permitted, and Eagle Harbor presented, expert testimony as to the appropriate royalty rate for the APA system. 3/17 Tr. 35:14-43:23. At a minimum, the jury should determine the royalty rate. But the Court should permit the jury to award reasonable royalty damages, as well, because no evidence in the record supports the award of a zero royalty. *Apple Inc. v. Motorola,*

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 14*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

*Inc.*, 757 F.3d 1286 (Fed. Cir. 2014), teaches that a fact finder may award no damages only ***where evidence in the record establishes that the parties would agree to a zero royalty***. *Id.* at 1328. In *Apple v. Motorola*, the district court excluded the vast majority of both parties' damages expert evidence and then granted summary judgment that neither side was entitled to damages. 757 F.3d at 1294. The Federal Circuit reversed the grant of summary judgment as to damages. though it did not reverse the district court's admissibility determinations as to all patents. *Id.* at 1327. The Court found that, because the statute requires the court to award "no less than a reasonable royalty," *id.* (citing 35 U.S.C. § 284), even without expert testimony in the record, "the fact finder is still required to determine what royalty is supported by the record." *Id.* Accordingly, "a fact finder may award no damages only when the record supports a zero royalty award." *Id.* at 1328. Further, "a finding that a royalty estimate may suffer from factual flaws does not, by itself, support the legal conclusion that zero is a reasonable royalty." *Id.* at 1327. There is no contention here that a zero royalty is supported by the evidence. Where the evidence does not support a zero royalty award, and to the contrary provides a basis for the jury to award damages for Ford's infringement of the '137, the Court should permit the jury to determine the reasonable royalty.

### B.   Mr. Wagner Properly Apportioned for APA.

Ford is simply incorrect in asserting that Mr. Wagner did not properly apportion the non-patented features of the APA system. Mr. Wagner testified that the Front Park Aid and Rear Park Aid features used with the APA system were not included in his baseline incremental profit calculation. 3/17 Tr. 37:7-38:3. Those features, then, did not need to be apportioned out. Mr. Wagner further testified that he apportion out the value of the automated steering – the only other non-patented technology present in APA – in his analysis of *Georgia-Pacific* factor #13. 3/17 Tr. 37:7-38:3, 43:7-18. While Mr. Wagner did not have the data to quantify the apportionment as precisely as he did for SYNC, but as part of his analysis of *Georgia-Pacific* factor #13, he did apportion between patented and non-patented technology. *Id.*

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 15*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

**C.   Mr. Wagner Used the Correct SSPPU and Properly Apportioned for SYNC.**

In denying Ford's *Daubert* Motion on this issue, the Court reasoned that Mr. Wagner should be permitted to testify because:

> Mr. Wagner does not base his opinion on sales of Ford cars. Instead, he has based his calculations on SYNC being the smallest salable device. While Ford has shown by way of cross examination that portions of the SYNC system may provide value independent of the alleged infringing technology, Ford has failed to show that Mr. Wagner's starting point is unrealistic or that his testimony will have a prejudicial impact on the jury. Unlike the situation the court addressed in *VirnetX*, SYNC is not a personal computer or smart phone that is designed to run hundreds, if not thousands, of applications. SYNC is an embedded infotainment system and it is within the realm of reasonableness to start with this system to evaluate infringement damages.

Order Granting in Part and Denying in Part Ford's Motion to Exclude Wagner (Dkt. No. 575) at 7. The only thing that has now changed is that Mr. Wagner has testified that he was aware of the concept of the smallest saleable patent practicing unit and that he relied on Dr. Min's testimony and his own judgment in using the SYNC system as the SSPPU in his analysis. 3/17 Tr. 76:21-77:21. Further, Mr. Wagner provided extensive testimony concerning the quantitative apportionment he conducted for the SYNC system, based on Dr. Min's opinion about the three key functionalities of the SYNC system. 3/17 Tr. 21:9-23:7. While Ford takes issue with the fact that Mr. Wagner did not apportion out the hardware specifically, Mr. Wagner testified that he did deduct the costs relating to this hardware. 3/17 Tr. 19:23-20:9. Further, there is no legal requirement that Mr. Wagner do so. Unlike in *VirnetX*, the hardware components in the SYNC system are not "indisputably not claimed by [Eagle Harbor]." *VirnetX v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). To the contrary, the asserted Infotainment claims each include both hardware and software components. Mr. Wagner's SSPPU and apportionment of the SSPPU were entirely appropriate.

**D.   Mr. Wagner's Use of Professional Judgment Does Not Warrant Judgment as a Matter of Law.**

In denying Ford's *Daubert* Motion on this issue, the Court reasoned that Mr. Wagner should be permitted to testify because:

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 16*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

> If there is one area of law that requires professional judgment, it is an opinion on a hypothetical negotiation that was to have occurred many years ago. While the Court agrees that an expert should be precluded from pulling a number out of thin air, Ford has failed to show that Mr. Wagner's analysis is either unreliable or irrelevant. Therefore, the Court denies the motion on this issue.

Order Granting in Part and Denying in Part Ford's Motion to Exclude Wagner (Dkt. No. 575) at 4. The only thing that has now changed is that Mr. Wagner has testified to the detailed consideration he gave to each of the *Georgia-Pacific* factors, as well as the facts, circumstances and evidence in the present case, in opining on the appropriate royalty rate. *See, e.g.*, 3/17 Tr. 23:11-33:23. Ford fails to identify any flaw in his testimony, and a reasonable juror could conclude that it supports an award of reasonable royalty damages.

### E.  Mr. Wagner Properly Considered, But Did Not Find Probative, Himmelstein, the EHH/Medius, Inc. Transaction, and Continental Teves.

Ford's request for judgment as a matter of law because "Eagle Harbor's claim for damages is excessive" amounts to little more than an assertion that Ms. Davis's analysis was superior to Mr. Wagner's. But as the Federal Circuit has noted, "[i]t is common for parties to choose different, reliable approaches in a single case and, when they do, the relative strengths and weaknesses may be exposed at trial or attacked during cross-examination." *Apple v. Motorola*, 757 F.3d at 1315. Differences in equally reliable approaches do not warrant judgment as a matter of law; to the contrary, they highlight the important role of the jury in weighing such differing approaches.

Ford argues that Mr. Wagner erred in dismissing the Himmelstein license agreement, the Continental Teves license agreement, and the purchase price in the EHH/Medius, Inc. transaction. Mr. Wagner dismissed Himmelstein and Continental Teves because of their lack of technical comparability, and he relied on the expert opinion of Dr. Min to conduct the technical analysis. 3/11 Tr. 198:21-199:22. Relying on the opinion of an expert in another area of expertise, as Mr. Wagner did, is a perfectly appropriate, reliable methodology under the law. *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field.").

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 17*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

In ruling on Ford's *Daubert* motion with respect to this issue, the Court denied Ford's motion, ruling as follows:

> Ford argues that Mr. Wagner's opinion that the Hammerstein license does not cover similar technology should be excluded because he improperly relied on the expert testimony of Dr. Paul Min. The parties dispute whether Dr. Min actually provided any opinion on the issue of comparable technology. The Court concludes that this issue shall be reserved for trial. If Dr. Min does provide the requisite foundational testimony, then Mr. Wagner may rely upon that testimony. Otherwise, Mr. Wagner will not be allowed to discuss the absence of any license for comparable technology.

Dkt. No. 575 at 8. At trial, Dr. Min laid just such the requisite foundational testimony that the Himmelstein license agreement is for technology that is not comparable to that at issue in the Infotainment Patents. 3/11 Tr. 198:21-201:11. He testified generally that he did not view any of the licenses Ford had produced in discovery as comparable, *id.* at 199:20-22 ("Q And what was your conclusion regarding whether any of the licenses Ford had produced in discovery were comparable? A I have not seen one that I view as a comparable."), and then he testified specifically about the Himmelstein patent, including that the Infotainment Patents issued over the Himmelstein patents, and that Ford had not asserted that the Himmelstein patents were invalidating prior art to the Infotainment Patents. *Id.* at 200:14-201:11; *see also* 3/12 Tr. 74:21-75:3. With that foundation, Mr. Wagner testified as to why he did not find Himmelstein probative, and Ford did not renew its objection to that testimony. Similarly, Mr. Wagner provided competent testimony, relying on the technical expertise of Dr. Min, as to why he did not consider Continental Teves license agreement to be a reliable data point. 3/17 Tr. 86:7-18.

Mr. Wagner likewise provided competent testimony as to the reasons that he did not consider the EHH/Medius, Inc. transaction to be probative of the value of the patents. 3/17 Tr. 80:11-83:12, 87:15-91:9. While reasonable minds can differ as to the relevance of this transaction, this is no basis for finding that Mr. Wagner's opinion that this transaction is not probative is a basis for granting judgment as a matter of law.

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 18*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T(206) 516-3880/F(206) 516-3883

1

**V.      CONCLUSION**

2          Eagle Harbor respectfully submits that Ford's Motion for Judgment as a Matter of Law

3    should be denied.

4

5    Dated: March 18, 2015              **SUSMAN GODFREY LLP**

6                                       By: */s/ Ian B. Crosby*
                                        _____
7                                           Parker C. Folse III (WSBA No. 24895)
                                            Ian B. Crosby (WSBA No. 28461)
8                                           Floyd G. Short (WSBA No. 21632)
                                            Genevieve Vose Wallace (WSBA No. 38422)
9                                           Jordan Connors (WSBA No. 41649)
                                            E. Lindsay Calkins (WSBA No. 44127)
10                                          1201 3rd Avenue, Suite 3800
                                            Seattle, WA 98101
11                                          Tel: (206) 516-3861
                                            Fax: (206) 516-3883
12                                          E-Mail: pfolse@susmangodfrey.com
13                                              icrosby@susmangodfrey.com
                                                fshort@susmangodrey.com
14                                              gwallace@susmangodfrey.com
                                                jconnors@susmangodfrey.com
15                                              lcalkins@susmangodfrey.com

16                                      *Counsel for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

*EAGLE HARBOR'S OPP'N TO FORD'S*
*MOT. FOR JUDGMENT AS A MATTER OF LAW*
*Case No. 3:11-cv-05503-BHS*
*Page 19*                                    SUSMAN GODFREY L.L.P.
                                             1201 Third Avenue, Suite 3800
                                             Seattle, WA 98101-3000
                                             T(206) 516-3880/F(206) 516-3883

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on March 18, 2015, I electronically filed the foregoing with the

3 Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

4 counsel of record.

5

6                                    */s/ Ian B. Crosby*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883